[Civ. No. 10171.   Third Dist.   Feb. 1, 1962.]

Estate of GEORGE E. NICHOLS, Deceased. RANDALL LEON JOHNSON et al., Plaintiffs and Respondents, v. ELIZABETH McCAFFREY, Individually and as Executrix, etc., Defendant and Appellant; LILLIAN MOON et al., Defendants and Respondents.

Timothy A. O'Connor, Arthur W. Walenta, Jr., and Victor A. Bertoloni for Defendant and Appellant.

P. M. Barceloux, Burton J. Goldstein, Goldstein, Barceloux & Goldstein and Reginald M. Watt for Plaintiffs and Respondents.

Blade & McDonald and Robert V. Blade for Defendants and Respondents.

PIERCE, J.—The question presented on this appeal is whether appellant, Elizabeth McCaffrey, takes under the will of her brother, George E. Nichols, deceased (a) his entire estate (excepting for certain specific bequests) absolutely, or (b) his entire estate (with said exceptions) for life, with remainders in certain others, or (c) one-twelfth of the residue of the estate.

Decedent died in September, 1958, leaving an estate value in excess of $200,000 under a holographic will, a reproduction of which is included herein on pages 785 and 786:

The "Dear Sis" and "to my Sis Bess" referred to is decedent's sister Elizabeth McCaffrey, the appellant. "Tom Tomnitz" is Emil Tomnitz, a neighbor across the street from the Nichols home in Paradise. "Lew" is his wife. "Litteice Osborne" is Lettice Osborn, a next-door neighbor of Mr. and Mrs. Tomnitz, a widow. (She and Mr. Nichols were planning to be married.) "Our Bro & Sisters" refers to Waldo Nichols, Chleo Graham and Letha Payton, a *foster* brother

and two *foster* sisters of both decedent and appellant. (To explain this foster relationship, the real surname of George Nichols and the maiden surname of appellant was "Cox." George and appellant were raised by the Nichols family. Never formally adopted, George nevertheless took the name of "Nichols.") "Becca" was decedent's predeceased wife. Her

July - 31 - 1958

1 page and a little over

My last will as I am
going to be opperated on
tomorrow Dear Sis I want
you to see that Leu & Tom
Tomnutz gets 5700.00 Cash
out of my estate and also
you will find an agreement
I have with them in my
sport coat Jacket stick to
that agreement also I want
Leacy Litteico Osborne to
receive $150.00 per month
as long as she lives or
untill she gets married
again. The agreement with
Tom is about the property
a cross the St now you can
seapve as my Executor
with out bond and after
you get through with it if
there is any left see that
it goes to our Bro & Sisters and

maiden name was "Johnson." "Beccas Bro & Sisters" are respondents Randal Leon Johnson and Ethel Johnson Devine, and Jennie Johnson Pifer, not a party to the proceedings.

"Toms Kids" refers to the children of Tom Cox, the predeceased brother of decedent and appellant, i.e., their nephews and nieces. They are: Respondents Clark T. Cox, Charles E.

*i*

Beccas Bro & Sisters see That Toms Kids each, gets the Same amount as the Sisters and Bros do please take Care of it is for me
Signed By me

July 31 - 1958
Geo. E. Nichols.
To my Sis Best
good luck and god Bles you

mark Roy Hopkins no paid just as soon as he has paid what he ows me with out entrest and mark Harry Johnsons note paid in full all so one from audraged.
Geo. E. Nichols
give Randal the Shop Smith he would it

Cox, and Lillian Moon, and two nieces who are not parties, Lena Hill and Audrey Crawford.

The basic factual background is this:

George Nichols (Cox) was born in 1890. His sister, Bess, the appellant, was (according to the ages given at the trial) either a twin or at most, a year younger. They were two of five Cox children, only three of whom, Tom, George and Bess, reached maturity. They were orphaned as very young children and taken into the Nichols home where they were raised.

George was married to Becca in 1909 when he was 19 years old. If they had had any children, they had died without issue before decedent's death.

The couple had lived in Los Angeles during the latter years where Nichols had operated or kept a "shop" until his retirement in 1953 when the couple moved to Paradise in Butte County.

In 1955 Nichols, his wife Becca, and Becca's sister were involved in an accident on a mountain road in which Becca and Hanna were killed and Nichols was severely injured. Although he recovered, it appears his health declined from then until his death in September 1958.

Appellant, Bess McCaffrey, a widow residing in San Jose at the time of the accident, left her home, went to Paradise and took care of her brother, remaining with him in residence at his home nearly continuously until his death, excepting for a brief period of a few months during his visit to the Mayo Clinic in Rochester, Minnesota.

The will in question was made in July 1958, the day before an operation. He died less than two months thereafter. Other facts regarding the relationship between decedent and the parties here will be discussed below.

The trial court, in construing the will which has been quoted in full above, determined that there was no specific bequest to appellant; that the word "it" in the phrase "and after you get through with *it* if there is any left," etc., referred to estate in appellant's possession as executrix at the conclusion of probate. The judge also held, however, that the testator intended, by the use of the pronoun "our" to include the appellant, his executrix, in her individual capacity to share alike with the foster brother and sisters, with the nieces nephews and with the Johnsons. In this regard the following appears in the transcript:

Mr. McDonald in his argument for the Cox family, re-

spondents, had argued that "As a matter of law she can not inherit anything from this estate." Then it is stated:

"THE COURT: It seems to me that the phrase our brother and sisters, the our is, shall we say, the pontifical pronoun of it was, what's the word for it?

"MR. PECKHAM [Attorney for Petitioners]: Royal plural. Editorial.

"THE COURT: Editorial. In some sense there is a more cogent phrase."

We take the opposite view to the trial court's, both in the interpretation of "after you get through with it" and in the interpretation of "our."

We do not agree that the word "our" in the phrase "our Bro & Sisters" is capable of the interpretation given. There is no evidence here that the testator was either "pontifical" or given to the use of the "royal" or "editorial" pronoun. He was apparently an unlettered and unpretentious man. He was, moreover, in this will addressing "Dear Sis" and "to my Sis Bess" as he would in writing her a letter. One, in so addressing another, and particularly after saying "after *you* get through with it" simply does not include the person addressed as the *object* of the sentence "see that it goes to our Bro & Sisters." *She is, instead, the subject of that sentence.* Appellant, moreover, is not even a member of the *class* contemplated by the phrase "our Bro & Sisters." These were foster siblings; appellant was a blood relative.

Therefore, to hold that appellant was included within the mentioned group of persons claiming as residuary legatees is to indulge in fantasy. It is to make a will for the testator, not to interpret his will. Whatever his intent, it manifestly *was not* to include appellant within the phrase "our Bro & Sisters." What "our" did mean was "yours and my;" which is what it usually means.

It will be seen, moreover, in the discussion of the evidence which follows, that even if we are to assume some nonexistent ambiguity in the use of "our" the construction placed upon it by the probate court attributes to the testator an intent to treat a sister who lived with him and was dependent upon him for support (save for social security) exactly the same as a sister-in-law with whom he had had only the most casual contacts, who had been unwelcome in his home during his wife's lifetime, and who, with others in the classes named, had no disclosed need for his bounty, nor any expectation of receiving it.

The matter of the pontifical, royal or editorial "our"

having been determined, the remaining inquiry becomes materially narrowed. The question now becomes: Did the testator, by the remaining provisions of the will, intend to disinherit appellant—his sister, and closest blood relative?

The provision of the will to which we must look to answer this question is the phrase following the testator's designation of appellant as his executrix: "and after you get through with it if there is any left see that it goes," etc.

Respondents have referred us to a note in 104 American Law Reports, page 114, and cases cited thereunder, to the effect that there is a presumption that a gift to an executor is in his representative capacity, and that to justify a court in reaching a contrary conclusion there must be language in the will which clearly expressed such an intent. Appellant, on the other hand, cites respectable judicial opinion that "No authority is given for this extreme statement . . . Nor is the rule a cardinal rule of construction." (*Gilman* v. *Gilman,* 99 Conn. 598 [122 A. 386, 390].) No California case is cited by either party.

In *Estate of Karkeet* (1961) 56 Cal.2d 277 [14 Cal.Rptr. 664, 363 P.2d 896], where the will was addressed "To Whom it May Concern" and read: "This is my authorization to Miss Leah Selix, 832 Green St., San Francisco, California, to act as executrix of all and any property and personal effects (and bank accounts) to act without bond or order of Court," the Supreme Court, reversing the trial court, held that this language did not necessarily demonstrate a testamentary intention to provide only for the creation of an executor.

The court also stated (on p. 283) it was reasonable to conclude that the testatrix "having prepared the will herself and not being familiar with the more modern technical meaning of the term 'executrix' the decedent designated her close friend as such intending that she be the residuary legatee. . . ."

It is true that in *Karkeet* the alternative to the construction was that decedent's property would escheat to the state and this was mentioned repeatedly in the opinion of the Supreme Court as a factor in its determination. It must be concluded, nevertheless, that the court did consider that mere authorization to a person to act as executrix did not preclude interpretation of a dispositive intent to the person named in an individual capacity.

That being so, we have in this case the additional language

(not present in *Karkeet*) : "and after you get through with it *if there is any left*," etc. In this the phrase "after you get through with it" does not necessarily limit itself to a temporary possession of the property of the estate during probate. It is susceptible to a longer period of tenure, towit: the lifetime of appellant. And this latter interpretation is strongly fortified by the succeeding words: "if there is any left." This expresses doubt, yet here the testator owned an estate of over $200,000, and he also knew that the specific gifts he had made with precedence only involved $5,000 to his friend Tomnitz, and an annuity of $150 per month to a person who we understand is elderly. These small gifts could not possibly have created the doubt or speculation shown by "if there is any left." If, on the other hand, he was thinking of that estate which would remain after an unrestrained exercise by his "Sis Bess" of her rights as a life tenant with power to invade corpus, then the phrase "if there is any left" is meaningful.

Appellant asserts that the intention is too clear to permit of any other construction; but we do not deem it so.

As stated in *Estate of Karkeet, supra* (on page 283): ". . . We cannot say, however, that such a conclusion is compelled as a matter of law from the will itself. . . . the mere use of the [technical] term may well be deemed to create an uncertainty or ambiguity."

We must turn, therefore, to the circumstances under which the will was made "for the purpose of resolving this apparent ambiguity." (*Estate of Karkeet, supra.*)

The 152-page transcript contains less than 90 pages of testimony, most of which was produced by Elizabeth McCaffrey. Direct testimony of witnesses for the "Johnson" and "Cox" heirs together covers only 7 pages of transcript. Nevertheless, we find in this short record what we deem to be a very clear picture of the testator's intent. In reading this testimony we have had in mind that we are searching to find not only who the natural objects of the bounty of decedent were, but in what order of priority he naturally would have regarded them.

There was, first of all, Lettice Osborn, who, although he had known her for only a few years, had been a close friend of Nichols and his wife during the period of their residence in Paradise. After the death of Mrs. Nichols, George Nichols and Mrs. Osborn had apparently found mutual interests and a warmth of friendship and companionship flowering into a plan to marry, which Nichols' death frustrated.

Nichols, however, in making his will did not recognize his dear, but, after all, recent, friend as his sole, or even principal, object of bounty. Instead, he constituted his sister Bess as his trustee and directed her, in effect, to set aside enough of his $200,000 estate to provide Lettice with $150 a month for the rest of her life or until her unlikely remarriage.

Whom then *did* Nichols desire to have the bulk of his fortune: His "in-laws," foster brother and sisters and nieces and nephews? Or his only sister? The record leaves not the slightest doubt that he intended the latter.

Appellant and decedent, as shown above, had the closest ties, not only of blood, but of age, and also of adversity, having been orphaned as young children and taken together into a foster home. The fact that this relationship, close in its inception, had not weakened throughout the years is evidenced by appellant's prompt reaction to her brother's trouble—the tragedy of the death of his wife and testator's own serious injuries. She left her home in San Jose, gave up her own home-ties and went to him, to nurse him, care for him and keep his house. And this arrangement continued until his death, uninterrupted except during the period when Nichols' failing health sent him to the Mayo Clinic.

There is no substantial evidence whatever of any real lack of accord between brother and sister during this period. Appellant produced as witnesses Nichols' closest friends and neighbors while in Paradise. She also produced Lena Hill, one of the nieces, as her witness. All testified to the closest affectionate relationship between Nichols and his sister. None of these witnesses had any perceivable reason to dissemble or color their testimony. Mrs. Hill, in the same adversely interested class as respondent nieces and nephews, had refused to join in their claims.

The most significant testimony of these witnesses is to Nichols' statements of his testamentary intent: To Mrs. Hill, during Nichols' bedridden period: "Well he just spoke up and he said I may not live through this and if I don't I have plenty to take care of Bess the rest of her life, she's all I have, and I'll see that she is taken care of;" to Veva Meggers, retired school teacher, next-door neighbor and friend, just before he went into the hospital during his last illness (as a part of a conversation regarding wills): "Well you know, I'll always take care of Bess;" to his intended wife, Lettice Osborn, "he said he'd always take care of her [his sister] and provide for her;" to his friend and neighbor and legatee, Emil

Tomnitz: "he said on a number of occasions . . . that she'd never want for anything as long as she lived, that he was going to take care of her;" to Nick English, gardener (during a conversation, each to the other, about blood relatives) : "well the only one I got left is my sister that lives in San Jose and I got a couple of nieces up in Oregon, some place north." In addition, his accountant and income tax records showed that Nichols took appellant as a dependent in 1956 and 1957 and it is also undisputed her only income was and is her social security payment.

The respondent niece Lillian Moon and nephews Clark and Charles Cox produced no witnesses. The Johnson family defendants produced three: Two of Becca's sisters, Ethel Devine (who had previously been called for cross-examination by appellant), and Jennie E. Pifer; and Lessie Johnson, wife of respondent Randall Johnson.

The only one of these three who attempted, even faintly, to discredit the warm relationship between Nichols and appellant, was Mrs. Devine. Her testimony in this regard was in response to a leading question: "Q. Did he ever mention anything to you about whether or not Bess got on his nerves or anything? A. Bess got on his nerves terribly and he got on her nerves terribly. . . . He told me he couldn't live with her. Q. Why not? A. She was too bossy and he told me he thought, believed her, she was deceitful, she was no friend of mine. He told me." We deem this evidence inadequate to create any real conflict or to substantiate, even remotely, a contention that Nichols intended to disinherit his sister. The statement that "he couldn't live with" appellant is negated by the fact that he *did* live with her—during the last three years of his life. Any inference that he didn't trust her is negated by the fact that he gave her full charge of his business affairs during the period when he was unable to attend to them personally; also by the fact he named her the executrix of his will and to take charge of the annuity to Mrs. Osborn.

There was no testimony by Mrs. Devine, or by any other witness that the testator ever expressed any intent whatever to make any of them, or any of the other persons mentioned in the "residuary" clause, beneficiaries of his estate. Nor is there any testimony that any of these persons have any need for, nor any expectation of receiving, *any* of his estate. Mrs. Devine, who was the only one of the Johnson family who had been in close touch with her brother-in-law after the Nichols left Los Angeles, testified she was "always welcome"

in his home. "George was friendly with all of us. In fact, he was like a brother. We loved him and he loved us." The testimony of Mrs. Pifer, 80 years old, was of little value. It had been testified by some of appellant's witnesses that Mrs. Pifer wasn't permitted in the Nichols home during Becca's lifetime. Mrs. Devine testified, on cross-examination, that she wouldn't quarrel with that statement. Mrs. Pifer rebutted this testimony with a statement that "my sister and I had a misunderstanding, but it was never to the point where I was refused admittance to their home, never." She also testified that Nichols had told her "he had lived around us so closely [in Los Angeles] for so many years that he [*sic*] seemed like we were really his own sisters."

Mrs. Lessie Johnson, wife of Randall Johnson, testified that Nichols and her husband "got along very nicely." She also testified that during the entire period of the residence of the Nichols in Paradise, they had visited them four times "not oftener than that."

This was all the testimony to substantiate the claims of the Johnson family to Nichols' bounty. Much of it was contradicted by appellant's witnesses. Also, against the Johnson family was the fact that the death of their sister, Hanna, in the automobile accident in which Mrs. Nichols was also killed, and Nichols injured, had produced the threat of a lawsuit against Nichols and a partial, at least, estrangement with that branch of the Johnson family. No testimony whatever indicated any claim by the other respondents. The foster brother and sisters, with whom the testator was perhaps on closer terms than the others never even appeared to question appellant's superior claims to the estate. Lena Hill, one of the nieces, supported appellant's claims. Another niece, respondent Lillian Moon, although in court at the trial, was not called to testify.

There is significance, we think, in the parties who appeared in this proceeding to contest the claim of the sister, Elizabeth McCaffrey. They were not those who had been closest in the affections of the testator in the later years of his life. (Some of these intimate friends, neighbors and relatives, Lena Hill, Lettice Osborn, Veva Meggers, Emil Tomnitz, testified for Mrs. McCaffrey. And the others, the foster brother and sisters, Waldo Nichols, Chleo Graham and Letha Payton, and the niece Audrey Crawford, declined to join in the proceedings.) The contestants, on the other hand, were those with the most

casual contacts, or without any; persons with the least claims upon his bounty.

That their testimony lacks substance even to suggest an intent by Nichols to omit appellant from his will seems to be recognized, at least, by the attorney for the respondent niece and nephews, Mr. McDonald. During his oral argument he stated: "I think it is reasonable to believe that he [Nichols] held no particular animosity to his sister. Perhaps there were times when she did boss him around and he would become annoyed at her, but obviously he didn't hold that against her."

We conclude, therefore, not only that the testator did not intend to disinherit his sister, and closest blood relative, but also that he intended her to be his principal beneficiary. We reach this conclusion under the terms of the will itself, the evidence of the testator's declared intent explaining the holographic will's ambiguity, and well-established rules in aid of will construction. (Prob. Code, §§ 101, 102, 103, 106; 4 Witkin, Summary of Calif. Law, Wills and Probate, §§ 117, 120 [favoring blood of testator], § 122 [gift may be made by implication]; 53 Cal.Jur.2d, Wills, § 377, n. 2 [extrinsic evidence admissible to construe ambiguous will]; *idem,* § 404 [consideration of testator's educational or linguistic background]; *idem,* § 405 [lack of familiarity with legal terms].)

In reaching the foregoing conclusion we neither usurp the functions of the probate court nor trespass upon its prerogatives. That court's review of the evidence was predicated upon an erroneous ruling on a matter of law: An interpretation of the language of the will itself, an unjustifiable belief that the use of "our" in the will was "pontifical, royal or editorial." This error, once corrected, leaves the evidence on the issue of intent to include or disinherit appellant, clear and unequivocal. (*Estate of Platt,* 21 Cal.2d 343, 352 [131 P.2d 825]; *Estate of Pearson,* 90 Cal.App.2d 436, 438 [203 P.2d 52]; *Estate of Donnellan,* 164 Cal. 14, 19 [127 P. 166].)

▮ What has been stated above does not dispose of the case. The foregoing review of evidence, although placing the nieces and nephews, the foster brother and sisters of the Nichols family (who make no contention otherwise), and "Becca's Bro & Sisters" in a position definitely secondary to appellant as objects of the testator's bounty does not justify a conclusion that he intended appellant to have all of the estate remaining after satisfaction of the specific bequests and annuity absolutely and without restriction. He intended, in our opinion, both by the language of the will, "and after you

get through with it if there is any left see that it goes to" etc., and by the evidence in the record, that appellant should have a life estate, with full power to invade corpus to the full extent of her own needs and pleasure. But the words "see that it goes to" etc., as used here, are not merely precatory; they show an intention that the life estate was to be limited by the condition that the life tenant could neither give the estate away during her lifetime, nor make a testamentary disposition thereof—Nichols having named the nieces, nephews, foster brother and sisters, and his brother-in-law and sisters-in-law as remaindermen.

This conclusion is supported by *Adams* v. *Prather*, 176 Cal. 33 [167 P. 534], by *Estate of Mayhew*, 4 Cal.App. 162 [87 P. 417], and by *Estate of Smythe*, 132 Cal.App.2d 343 [282 P.2d 141]. In the latter case Justice Vallée cites, collects, and exhaustively reviews the cases distinguishing "gifts over" of an undisposed portion of an estate devised in fee, which are void, from gifts of the undisposed remainder of a life estate. ▮ He states, on pages 345-346:

"A life estate is an estate whose duration is limited to the life of the person holding it or of some other person. (16 Cal. Jur. 366, § 2.) ▮ 'It is not an essential requisite to the giving of a life estate, that it be expressly declared to be such, nor that the term "life estate" shall be used. The intention can as well be manifested by other words, referring to the estate conveyed and describing its characteristics, and if by that means the intention to vest a life estate, only, is shown, it will be as effectual as if it were expressly so stated.' . . .

▮ ". . . A life estate with power to use and consume part or all of the principal for specified purposes and a limitation over of the remainder on termination of the life estate has long been recognized in this state. . . . Such power . . . does not enlarge that estate into an estate in fee. . . ."

No point is served by repeating here the citations given in *Estate of Smythe, supra,* nor a review of their holding. One further excerpt from *Smythe,* quoting from *Estate of Prather, supra,* will serve to define the extent of, and limitations upon, the rights of appellant here. It is stated at page 348:

" 'The intention of Julia P. A. Prather as expressed in her will was to give her estate to her husband for his unrestricted use and consumption during the term of his natural life, with power to control, manage, exchange, sell, and dispose of the same, limited, however, in the exercise of such power to the purpose for which the property was given him, viz., his use

and consumption thereof. While as to the property, persons dealing with him in good faith would be entitled to protection as fully and to like extent as though he were absolute owner in fee thereof, *he could not as of right in his lifetime give it away or make it the subject of testamentary disposition at his death.'* "

One other matter requires discussion. Appellant contends that the trial court's order (pursuant to Prob. Code, § 584), directing the acquisition of a policy of insurance paying Lettice Osborn $150 per month for life did not take into consideration the possibility of her remarriage. This possibility can be resolved by modification directing that said policy, by its terms, shall constitute appellant as the contingent beneficiary in the event of the remarriage of Mrs. Osborn, appellant to take as life tenant, limited and with remainders as aforesaid, until the death of Mrs. Osborn.

The order appealed from is reversed and the probate court directed to make its order in accordance with this opinion.

Peek, P. J., and Schottky, J., concurred.

A petition for a rehearing was denied March 1, 1962, and respondents' petition for a hearing by the Supreme Court was denied March 28, 1962.